

# NUMBER 13-23-00010-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**GUILLERMO ZARATE VALDEZ,** Appellant,

**v.**

**THE STATE OF TEXAS,** Appellee.

---

### On appeal from the 377th District Court
### of Victoria County, Texas.

---

## MEMORANDUM OPINION

### Before Chief Justice Contreras and Justices Benavides and Longoria
### Memorandum Opinion by Justice Benavides

A jury convicted appellant Guillermo Zarate Valdez of continuous sexual abuse of a young child, a first-degree felony, and sentenced him to life in prison. *See* TEX. PENAL CODE ANN. § 21.02. The specific acts of sexual abuse alleged in the indictment and presented in the jury charge were indecency with a child by sexual contact. *See id.*

§ 21.11(a)(1). On appeal, Valdez contends that the evidence was insufficient to support his conviction because the State failed to prove that he committed the contact in question with the requisite intent to arouse or gratify his sexual desire. *See id.* § 21.11(c). Alternatively, Valdez argues that he is entitled to a new punishment hearing because his counsel failed to present any mitigating evidence during the punishment phase of trial, thereby denying Valdez of his constitutional right to counsel. We affirm.

## I.    BACKGROUND

Valdez was accused of sexually abusing his step-granddaughter K.E.[1] over a period of seven years while she was under the age of fourteen. Specifically, it was alleged that on multiple occasions, Valdez touched K.E.'s genitals with the intent to arouse or gratify his sexual desire. Although the trial spanned four days and included numerous witnesses, we highlight only the evidence that is necessary to our disposition of Valdez's appeal.

### A.    Guilt-Innocence Phase

The allegations first came to light when K.E. was thirteen years old. K.E.'s friend noticed concerning changes in K.E.'s behavior and appearance, and when the friend pressed K.E. for an explanation, K.E. reluctantly told her that "[s]he was getting molested" by "her grandpa." K.E.'s friend reported the allegations to her mother. During the ensuing police investigation, K.E. was interviewed by Mara Beth Israel-Uebe, a sexual assault

---

[1] Although the complainant's identity was not concealed at trial, we use only her initials here to protect her identity. *See* TEX. R. APP. P. 9.8 cmt. ("The rule does not limit an appellate court's authority to disguise parties' identities in appropriate circumstances in other cases."); *see also, e.g.*, *Thompkins v. State*, No. 13-20-00450-CR, 2021 WL 3776720, at *1 (Tex. App.—Corpus Christi–Edinburg Aug. 26, 2021, pet. ref'd) (mem. op., not designated for publication).

2

nurse examiner.

Israel-Uebe testified that, during the examination, K.E. disclosed details about the alleged abuse. K.E. told Israel-Uebe that the abuse began when K.E. was "5 or 6" years old and initially consisted of just "kissing" but progressed into "other stuff" when K.E. was "6 or 7" years old. K.E. could not recall "how many times it happened" but told Israel-Uebe "[i]t was always the same." K.E. would often visit her grandparents' home, and if she and Valdez were alone, Valdez would initiate contact with K.E. by giving her "wet" kisses on her "mouth." Valdez would then "put his hands down [K.E.'s] pants and touch [her]." K.E. clarified that the touching consisted of Valdez "rubbing his fingers" on her vagina and said that digital penetration occurred. K.E. also reported that Valdez would stop when her grandmother came home, saying he would leave the room and "just act like nothing happened." Finally, K.E. told Israel-Uebe that the vaginal contact stopped when she was "11" years old but that the kissing continued until shortly before the abuse was reported.

K.E., seventeen years old at the time of trial, provided additional details about the abuse during her testimony. K.E. said that, in addition to touching her vagina, Valdez would sometimes touch her breasts over and under her clothing and "grab [her] butt." She also recalled incidents where Valdez pushed her onto the bed and "would dry hump [her]" from behind. Although she could not provide an exact number, K.E. testified that the abuse occurred "[a] good amount of times," confirming it was "too many to count." She explained that she frequently visited Valdez's home and that the abuse occurred "[a]lmost every time" she was there.

Sylvia Valdez, K.E.'s paternal grandmother and Valdez's wife, testified on behalf

3

of the defense. At the time of trial, Sylvia and Valdez had been married for approximately fifteen years. Sylvia did not believe K.E.'s accusations for various reasons. First, although K.E. visited their household frequently and stayed with them "[e]very other weekend," Sylvia disputed that Valdez ever had an opportunity to abuse K.E. Sylvia explained that she was always home during the week because she ran a daycare for young children at the residence. Valdez, on the other hand, worked long hours, and when he returned home, "he'd be outside[,] or we'd cut the yard[,] or—you know[, we] would just sit outside." On the weekends, the family would spend time together, including K.E.'s father, who lived at the residence during a portion of the relevant period.

Sylvia also described a loving relationship between K.E. and Valdez, who coached K.E.'s softball team and traveled out of town for K.E.'s games. Sylvia said Valdez is a generous person but never showed any favoritism towards K.E. by purchasing her gifts or treating her better than K.E.'s younger sister. Finally, Sylvia noted that just a week prior to K.E.'s outcry, K.E. asked Valdez if she could live with them. According to Sylvia, K.E. had made this same request many times in the past, and Valdez responded as they always had, telling K.E. that she would first need to get permission from her parents. K.E. responded with apparent disappointment, saying, "They're not going to let me."

Valdez testified on his own behalf, echoing much of his wife's testimony. As to a lack of opportunity, Valdez explained, for example, that he worked in construction, which involved long hours and six- or seven-day work weeks when necessary. He also described an idyllic grandparent-grandchild relationship with K.E., saying that he and his wife essentially spoiled K.E. and her sister when they visited. Valdez denied K.E.'s

4

specific allegations and expressed his belief that she was "making this up."

## B.    Jury Charge & Verdict

Consistent with the indictment, the jury was instructed on continuous sexual abuse of a young child based on the predicate acts of indecency with a child by sexual contact. The jury found Valdez guilty of the offense, and the trial proceeded to the punishment phase.

## C.    Punishment Phase

Both sides waived their opening statements, and neither side presented evidence. During closing arguments, Valdez's counsel began by thanking the jury for their service and said he would get straight to the point. He asked the jury to consider the minimum sentence of twenty-five years' confinement. He suggested that such a punishment was "essentially a life sentence" for Valdez because Valdez was sixty years old and would be ineligible for parole, meaning Valdez would only be released if he reached the age of eighty-five. He also asked the jury to consider all the evidence from the guilt-innocence phase, including the testimony of his client, and "[b]alance that with your measure of punishment." Finally, counsel implored the jury to "temper your justice with mercy."

The State also noted that the jury could consider the evidence it heard during the guilt-innocence phase and asked for a life sentence. After the jury returned a life sentence, Valdez did not file a motion for new trial; instead, he proceeded directly with this appeal.

## II.    SUFFICIENCY OF THE EVIDENCE

By his first issue, Valdez argues that the evidence was legally insufficient to

5

support his conviction because the State failed to prove beyond a reasonable doubt that he committed the predicate offenses with the requisite intent; namely, that Valdez touched K.E.'s genitals with the intent to arouse or gratify his sexual desire.

## A. Standard of Review & Applicable Law

In a legal sufficiency review, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021). We defer to the jury's role as the factfinder, which includes "resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts." *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Anderson v. State*, 416 S.W.3d 884, 888 (Tex. Crim. App. 2013) (quoting *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007)). We consider "whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Murray*, 457 S.W.3d at 448 (quoting *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). Thus, we look to "events occurring before, during and after the commission of the offense." *Hammack*, 622 S.W.3d at 914. Circumstantial and direct evidence are equally probative, "and circumstantial evidence alone can be sufficient to establish guilt." *Id.* at 914–15.

"To obtain a conviction for continuous sexual abuse of a child, the State must show that the defendant committed at least two acts of sexual abuse against a child younger

than 14 years of age during a period of at least 30 days' duration." *Ramos v. State*, 636 S.W.3d 646, 651 (Tex. Crim. App. 2021) (citing TEX. PENAL CODE ANN. § 21.02(b)). The penal code defines "act of sexual abuse" to include indecency with a child by sexual contact other than touching the breast of the child. TEX. PENAL CODE ANN. § 21.02(c)(2). Among other prohibited conduct, a defendant commits indecency with a child by sexual contact by touching the genitals of a child with the intent to arouse or gratify the defendant's sexual desire. *Id.* § 21.11(c)(1). The defendant's intent is an essential element of the crime that "can be inferred from the defendant's conduct, his remarks and all surrounding circumstances." *McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. 1981).

## B.    Analysis

Based on the jury's verdict, Valdez concedes that the jury necessarily credited K.E.'s version of events over his complete denial. Expressed differently, Valdez accepts that the jury found beyond a reasonable doubt that he touched K.E.'s genitals and that the contact was continuous as defined by the statute. Nevertheless, Valdez argues "that the jury could not simply infer from the nature of the touching K.E. described that [Valdez] had the requisite intent to arouse or gratify his own sexual desire." As further support, Valdez points out that there was no evidence that he ever obtained an erection or ejaculated during the contact. Neither argument is availing.

First, Valdez's conduct and the surrounding circumstances overwhelmingly support the jury's inference that Valdez touched K.E.'s genitals with a lascivious intent. The jury heard testimony that each incident began with Valdez giving K.E. "wet" kisses

7

on her "mouth," followed by Valdez sticking his hands down K.E.'s pants and "rubbing his fingers" on her vagina, including digital penetration. Thus, contrary to his naked assertion otherwise, Valdez's contact with K.E.'s genitals can only be described as sexual in nature. *See Montgomery v. State*, 810 S.W.2d 372, 396 (Tex. Crim. App. 1990), on reh'g (June 19, 1991) (finding sufficient evidence of intent because the vaginal contact described by the complainants "can hardly be attributed to normal parental caretaking"); *Ranson v. State*, 707 S.W.2d 96, 97 (Tex. Crim. App. 1986) (finding sufficient evidence of intent where complainant "testified that appellant placed his mouth on her genitals and breasts and inserted his finger inside her vagina"). The jury also heard testimony that, at other times, Valdez touched K.E.'s breasts, grabbed her butt, or pushed her down on the bed and dry humped her from behind. *See Ranson*, 707 S.W.2d at 97 (noting that "evidence of a common pattern of similar acts is admissible as tending to prove the intent"). All of these incidents occurred when the two of them were alone at Valdez's residence; however, according to K.E., if Valdez's wife came home, he would stop, leave the room, and "just act like nothing happened." *See Montgomery*, 810 S.W.2d at 396 (evidence demonstrating consciousness of guilt "leads to an inference that . . . appellant harbored a specific intent to arouse and gratify his own sexual desire"); *see also Hoffman v. State*, No. 06-08-00073-CR, 2008 WL 4425657, at *3 (Tex. App.—Texarkana Oct. 2, 2008, no pet.) (mem. op., not designated for publication) ("The fact that Hoffman chose a time and a place where the risk of being seen was lower to place his hand on A.E.'s private parts and move his hand around suggests an intent to arouse or gratify Hoffman's sexual desire."). Finally, the frequency of the contact, described by K.E. as "too many to count,"

8

was another circumstance that supported the jury's inference. *See C.F. v. State*, 897 S.W.2d 464, 472 (Tex. App.—El Paso 1995, no pet) ("[Appellant's] repeat conduct gives rise to the conclusion that he acted with intent to arouse or gratify his sexual desire.").

As to Valdez's second argument, while we agree that evidence of an erection or ejaculation could serve as additional circumstances that support an inference of the requisite intent, we disagree that a lack of such evidence in this case makes the jury's inference unreasonable. A defendant's physiological response to the contact is not an element of the offense; instead, the statute focuses on the defendant's motivation for engaging in the contact. *See* TEX. PENAL CODE ANN. § 21.11(c)(1). As discussed above, Valdez's conduct and the surrounding circumstances provided fertile ground for the jury's inference that Valdez touched K.E.'s genitals with the intent to arouse or gratify his sexual desire. Viewing the evidence in the light most favorable to the verdict, we conclude the evidence supported the jury's verdict. Valdez's first issue is overruled.

### III. RIGHT TO COUNSEL

By his second and final issue, Valdez argues that he was denied effective assistance of counsel during the punishment phase because his trial counsel elected not to offer any mitigation evidence. In particular, Valdez claims that he and his wife were available to testify and that he would have benefited from such testimony.

### A. Standard of Review & Applicable Law

The United States and Texas Constitutions guarantee a criminal defendant the right to reasonably effective assistance of counsel. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; *see* TEX. CODE CRIM. PROC. ANN. art. 1.051; *Strickland v. Washington*, 466

9

U.S. 668, 686 (1984). To obtain a reversal of a conviction on grounds of ineffective assistance of counsel, an appellant must show: (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding. *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009) (citing *Strickland*, 466 U.S. at 687). "Deficient performance means that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Ex parte Napper*, 322 S.W.3d 202, 246 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 687). "The prejudice prong of *Strickland* requires showing 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 248 (quoting *Strickland*, 466 U.S. at 694).

The burden is on the appellant to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). The appellant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy. *See Strickland*, 466 U.S. at 689. "We commonly assume a strategic motive if any can be imagined and find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it." *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005). Counsel's effectiveness is judged by the totality of the representation, not by isolated acts or omissions. *Thompson*, 9 S.W.3d at 813.

"The decision whether to present witnesses is largely a matter of trial strategy."

*Lopez v. State*, 462 S.W.3d 180, 185 (Tex. App.—Houston [1st Dist.] 2015, no pet.). When an ineffectiveness claim is based on an uncalled witness, the appellant must show two things to satisfy the first *Strickland* prong: (1) the uncalled witness would have been available to testify; and (2) the witness's testimony would have been of some benefit to the defense. *Ex parte Sanchez*, 667 S.W.3d 324, 329 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd). These showings "may be established through either testimony on the record or an affidavit from the uncalled witness." *Id.*

## B.    Analysis

We question whether Valdez's ineffectiveness claim is sufficiently developed for review on direct appeal when Valdez did not file a motion for new trial. Without a motion for new trial, there is no affidavit or post-trial testimony from Valdez or his wife supporting his claim. *See id.* Valdez suggests that it is self-evident from the record that he and his wife were available to testify. Even so, it is not apparent from the record that calling them to testify a second time would have been beneficial. *See id.* Necessarily constrained by the limited record on appeal, Valdez can only point to testimony that he and his wife previously provided during the guilt-innocence phase. For example, Valdez notes that his wife "was present to testify about positive things in [his] life, such as the fact that he was supportive of K.E.'s softball, [that he] was financially supportive of K.E. when she was staying with [them], and [that he] spent time with his grandchildren." We fail to see how this redundant testimony would have been beneficial to Valdez, especially when Valdez's trial counsel expressly asked the jury to consider the entire record in assessing punishment. Any suggestion about other matters that Valdez and his wife could have

11

potentially testified to is entirely speculative and not supported by the record. *See id.*

Further, in the absence of a motion for new trial, Valdez's trial counsel was denied the opportunity to explain his challenged actions. *See In re S.L.*, 188 S.W.3d 388, 395 (Tex. App.—Dallas 2006, no pet.) ("Ordinarily, counsel should not be condemned as unprofessional or incompetent without an opportunity to explain the challenged actions." (citing *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002))). On the record before us, Valdez has not overcome the strong presumption that his trial counsel's decision to forgo the presentation of repetitive mitigation evidence was based on sound trial strategy. *See Strickland*, 466 U.S. at 689. Valdez's second issue is overruled.

## IV.    CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
5th day of October, 2023.

12